May it please the court, good morning my name is Terry Grimes and I represent Lamont Wilson in this appeal. This is an appeal against Dollar General resulting from a summary judgment ruling adverse to Mr. Wilson from the Western District of Virginia Danville Division. Mr. Wilson is blind in his right eye. He found work at Dollar General's warehouse in South Boston, Virginia about an hour and a half south of here in September of 2009. He's been blind since he was a teenager in his right eye, so he needs to be careful with his left eye, needless to say. He worked in the warehouse there with about 600 other people. Uneventfully, he was a good employee until February of 2010 when he developed a serious eye infection, something called iritis, which if untreated results in blindness in about 10% of the people it affects. So it can be quite serious, particularly if you don't have vision in your right eye. So he went to the doctor, I think on February 12, 2010, started prescribing. The doctor prescribed antibiotics for him, took him out of work for a period of time. Now that condition causes blurring, a tearing, a burning sensation, loss of vision, blurred vision, and some pain in his left eye. All told, he was out of work for about eight weeks until April 6, 2010 when he went back to his doctor at Dominion Eye Center who wrote him out for that night and put some drops in his eye that night as well. Well, actually, you skipped over five other times, four other times. Yes, sir. He was excused for a couple of days, and then four or five days, and then a couple of weeks, and then a month or something, six weeks, or whatever it was. And those were all the same condition, right? All true, Judge Niemeyer. All true. The point being, each time he had to go to the doctor, he took his work excuses or sent them to work just to keep work abreast of what was going on. Every word of that is true. And then that gets us to April 6, when he again was seen by Dr. Odom, who said he could return to work the following day. But he put some drops in his eye, so Wilson contacted work, and the HR lady there, Nikki Steinspring, said, well, stay out of work tonight. He worked the night shift, incidentally, 12 hours, four days a week at night. She said, come back the next day. That night, his eye got worse. The same thing. Burning, loss of vision, blurring. So he went to the ER and saw a doctor there, who wrote him out until the night. So then he couldn't drive. His mother drove him to the place of work. He met there with Nikki Steinspring, who told him, in essence, listen, we got this note from the first doctor saying you could work after the 6th. Well, now you got this ER note saying you can't work until the night, either show up or be fired. He said, I can't show up, I can't see, I can't work. And the discourse is in the record, she fired him on the spot. And that was the end of his employment with Dollar General. Now, his mother drove him to the VEC, Virginia Employment Commission, where he filled out that paperwork to get unemployment benefits. And the VEC, it was, suggested that he file with the EEOC, thinking this may be a violation of the ADA, and that's how we got to where we are. So that gets us to Judge Kaiser's decision on summary judgment. I gather he acknowledges that even after that two days, he couldn't come back to work. He does. I mean, it's a sad case. And then even later, he had to have an operation. Yes, that gets me to the second point, because that... Yes, yes. And it really conflates two separate points in time, two separate eye conditions. That's one point that I was going to make. But when Judge Kaiser had the case before him, he had the evidence, and he said that he granted summary judgment because Wilson offered no evidence that his leave was finite or that it would have allowed him to return to work within a reasonable period of time. So then we combed the record on summary judgment to see whether that's the case, and we find that it's not. First, the leave was for a finite period of time. That's the note from April 7 to April 9, 2010. And then what evidence is there in the record that on April 9, he would have been able to perform the essential functions of his job? None. He could not have worked on April 9. But during discovery, he was asked by defense counsel, so tell us, when could you have come back to work? And what he said was, a week to a week and a half later. So the only unrebutted, and it's unrebutted evidence... I thought he said he didn't know. Well, what he says is, I mean, his exact words are in the transcript. He said, probably a week, a week and a half later, I guess. That's in the joint appendix of page 144. Now, he said he didn't know the exact day, Judge Nehmeyer. He was asked, tell us what exact day you can come back to work. Now, this is two or three years, and he couldn't answer that question. Well, it's also, you know, just to keep the facts before us, because the question in this case is going to be whether the accommodation he was seeking was something specific that could be addressed or was basically a leave of absence which couldn't be determined exactly. Because we go back in the prior year, he had how many days off? Five or six, seven doctor's letters, and he just continued to get them off. The doctors would give them off for a few days. That was not enough. Doctors give them off for a week. So that context, and then you get up to April, and finally a doctor says, you can go back to work now. You're released to go back to work now. And then he comes back and said, I can't do it. And then he sees another doctor in April, and the doctor says, two more days. And he concedes he couldn't go back to work then, but he just needed something, and he didn't really tell them how much time he needed, and he couldn't actually, to be fair. And so it presents that legal question of what is the nature of the accommodation that he needs, and was it reasonable? Well, yes, and of course it goes without saying, this is not disputed that time off from work is perhaps the most common form of accommodation under the statute. I don't think any of us disagree with respect to that particular point. So one question is when an employee makes a request for accommodation, which was thought to be two days, to April 9, 2010, is the proper reaction discharge? And I submit to you that it is not. Now, that's when we take our first snapshot into the mind of the employer. Now, as a practical matter, as you pointed out, Judge Niemeyer, he could not have gone to work on April 9, 2010, but what he said is, when he was asked, when could you come back, probably a week, a week and a half later, and the evidence in the record is... And where do you say that is in the record? Judge Agee, it's on page 144, the first volume, 1JA, page 144. Well, the question that was asked to him was, when did you start to look for another job? And he says he went to put his application in for unemployment, and he had to keep his job contacts up in order to be eligible for unemployment, so I guess probably a week, week and a half. That really doesn't say that he could come back to work and be at Dollar General after a week and a half. Well, in a sense... And certainly when you look at it in the context of the other evidence he gave in the case, this is as close as you get. Yes, sir. Let me back you up a question, Judge Agee, to the first question on the top of that page. Here was how the discourse started. How long after that April 7th date, that's the date when he went to the ER, was it that you could actually go back to working? Well, of course they meant Dollar General. The answer, I can't... Well, that may be debatable, because they're talking in terms of the unemployment benefits and the job contacts. But if it's debatable, we look at the evidence in the light most favorable to the non-moving party, Mr. Wilson. So then the very next question, which you pointed out, when did you start looking for another job? He answered that question in the last sentence of his answer, so I guess it was probably a week, a week and a half later, I guess. That's the inference. And then the other evidence is, his eye cleared up, he began to drive himself once again in Southside Virginia and Northern North Carolina looking for work shortly thereafter. And that was in April of 2010, just later that same month. So the inference to be drawn is that he could have worked between late April... It seems like you've got an evidentiary problem, because as you know, a party can't rise above their own evidence. And certainly on summary judgment, they can't make a genuine issue of material fact out of disputes within their own testimony. And so he's got other testimony in here, I think that Judge Niemeyer referred to, which indicates that he didn't know when he could come back, and he couldn't come back for a year. So I think it's hard to say you create an issue of material fact for summary judgment purposes based on contradictory testimony of a plaintiff. We're defendant for that matter. ...come back for a year. Once again, that conflates the two points in time. April of 2010 and November of 2010, when he had the surgery for the detached retina. We're talking about an eye infection versus a detached retina. He could see through the summer of 2010 into the fall until... And he had no money, but UVA Medical Hospital was kind or gracious enough to provide that surgery in November of 2010. And yes, then he went blind, completely blind, for seven weeks, and he couldn't see until June of 2011. But those are two separate points in time. The issue is... But isn't the key point in time April 7, 2010, when he asked for the two extra days accommodation? I think it is. All right. And at that point, you said he admitted that he could not come back to work. He couldn't do his job on April 9th at the time he was asking for April 9th. So how do we get beyond that? Because of the next question. He was asked, when do you think you could have come back to work? And he said... Now, they asked when were you looking for work. After the fact. On April 7th, when the decision was made, what information did the employer have that he could perform the essential functions of his job on April 9th? Only the work excuse from the ER doc saying he can go back to work on April 9th. They also had a doctor who said he was free to go back to work from the day before, April 6th. Correct. But we don't selectively exclude that. And it's not unusual. An employer is facing history that goes back months and months, goes back 8, 9 months with the same problem. The doctors give him 2 days off or 4 days off, and then it turns out it's not right, and now a doctor says you can return to work. April 6th, the doctor says that. So the employer gets that note and expects him to come to work. And then he comes up with a doctor's letter the very next day and says you can't come to work. I don't know where... And then he concedes that even that doctor's letter was not accurate because his eyes... The question isn't whether we can resolve that. The question is did he make an accommodation of a definite time when he could provide the employer with some... The employer only needs to act reasonably in response to a request... He has to ask for a reasonable request. Yes. And I think by then a dollar is saying, hold it, what kind of accommodation? We need an employee. We need somebody to work here. And this just hasn't worked out, and the accommodation he promises doesn't assure he can carry out the job. I don't know where you get the 8 or 9 months, Judge Niemeyer. Well, I'm talking start when it first started. Was it February of the prior year? No. When did he first have his problems? February 12 of 2010. It's only 8 weeks. It's not 8 or 9 months. Okay, 8 weeks. I apologize. Okay, 8 weeks. But didn't he have 4 notes, 5 notes from doctors? Yes, sir. Between February 12 of 2010 and April 6 of 2010, he went to the doctor 4, 5, 6 times. Yes, you're correct. Okay, that's what I was thinking. I've extended it. Yes. And so that's the question you have to address when you go in on April 7th with a note to keep him out 2 more days and the response is you're discharged. I mean, is that reasonable? Now, looking ahead, he could not have returned to work for at least another week and a half. And is that reasonable to have discharged him without additional knowledge? Set aside the retina surgery in November of 2010, I mean, I think that's a red herring. That's a separate condition that kept him out. But that's the question the court must address. I think I'll answer any other questions you have. Well, let me ask you this. Would you agree with the employer that the request for accommodation was leave of absence from work at an indefinite period? No, no. It was definite. What was the definite? To April 9, 2010. It was definite. That proved to be not reasonable right at the moment. In hindsight, right. In hindsight, that proved not to be reasonable, but he could have come back a week and a half later. Yeah, but that can't go into the reasonableness determination. Within, yes, was it definite? Yes, it was finite. And they had a note. They're talking on April 7, right? Right. He was fired on April 7? Yes, sir.  Yes, sir. That says he's ready to return. And he comes back and says, no, I'm not. How are they supposed to react to that? Wait, they also had the April 7 note. Well, they did, but I'm asking about this. You can't ignore the April 6 note. No, you can't ignore it. You can't ignore either note. Absolutely true. You can't ignore either note. They had both of them. And so in my view, the question is, was it reasonable to discharge them? You take your snapshot right then, given that they thought he was going to come back on April 7. Well, you say discharge. The reasonable discharge is not the question. The question is accommodation. Reasonable accommodation, if I misspoke, yes. I see my time is out. I have some time for rebuttal. Okay, thank you, Mr. Grimes. Mr. Haloftas, Your Honor. Haloftas. Yes. Thank you. Good morning. My name is Doug Haloftas, and I represent Dallas General in this matter. The court is laser-focused on the issue. Well, we got the issue, but you still need to speak to it. Oh, and I will. I will indeed, Your Honor. If I could tweak a couple of facts before I start talking about the issue, and that was Mr. Wilson worked for Dallas General for a period of about five months before the initial leave. He wasn't eligible for any family and medical leave because he hadn't worked the requisite hours of time that would make him eligible. Nonetheless, Dallas General gave him six weeks of medical leave, and as the court has pointed out, during that time, week by week, there would be these periodic notes from Dr. Odom saying that he was unable to see, and he could not continue to work. Well, you have to admit, he's a pretty sympathetic plaintiff to have. I mean, he's half-blind to start with. He's working, loading all these trucks. He's supporting his mama who's disabled. And Dallas General won't give him a break to let him come back to work, as Mr. Crump says, after a week and a half. Well, it is a sympathetic case, and no one would deny that, and I would be the last one. Mr. Wilson requested an additional two weeks after the six weeks was up, and Dallas General granted that. And then Dallas General, as the court has pointed out, received a note from Dr. Odom, Dr. Mr. Wilson's own physician, ophthalmologist, and it says he's able to return on February the 6th. I'm sorry, on April the 6th. And he calls Ms. Steinspring and says, some drops are in my eyes, I can't come back to the office. And she says, fine, come in tomorrow night for your shift. And during the course of that evening, he had to go to the emergency room. I mean, it is Mr. Wilson who's saying, I cannot see to do the job. This is what he's telling the HR department at the distribution center. He goes to the emergency room, he has a crisis that night, he tells Dr. Hong, I can't see, my eye is hurting. His mother has to drive him to the facility to have this meeting with Ms. Steinspring. Now, given the procedural posture that we're in, we have to accept as true the version Mr. Wilson presents of that encounter. And with all due respect, Ms. Steinspring's testimony is different, but we have to proceed with his version that he was terminated on the spot. And as the court pointed out, he had a note that said, well, he can't work, he needs an accommodation of two additional days to April the 9th. Now, as Judge Kaiser points out, this was from not his treating physician, this was from an emergency room physician. And it's not a note that says he will be able to return to work on April the 9th. It has a blank in it that says he can resume his duties as of this date, and it's left blank. And it says, if you're not feeling better, if this condition persists, please come back to the emergency room. So as Judge Kaiser points out, this was not a clear, unconditional release to return to work. Was there a discussion at that time on April 7th about how long he was going to be out? Well, there was, from the record, I don't think there was much of a discussion because it was Mr. Wilson who was saying, I can't see, I can't see to do the job. And Ms. Steinspring has said, well, you'll have to make a decision. You can resign, you can decide to come to work. He told her that on April 7th? Ms. Steinspring, yes, that he could not see to do the job. And even in his deposition, this point came up, and I'll give you the record sites, because we talked about this in the prior council's discussion, he could have returned in two days. And Ms. Bradbury asked Mr. Wilson in his deposition, record 114, could you have returned later in two days? And the answer is no, because I still had problems with my eyes up to two weeks later. How long would it have been before you could have returned to work? This is at page 115. I can't answer, because I had problems with my eyes. And then he says, really, and this is almost a mere image of the Myers decision from this court in 95. He says, I was asking, this is at 121, I was asking them to keep my job open until I was able to see. And then at 122, but you didn't know how much more time off you were going to need. And the answer was no. And I just think that puts us squarely in all fours with Myers, where this court says you cannot have a request for indefinite medical leave without any assurance that the employee will be able to fulfill the position's essential functions upon return, and that such a request is unreasonable as a matter of law. Lower courts in the circuit have proclaimed the same reasonable accommodation provision does not require an employer to wait an indefinite amount of time for an accommodation to achieve its intended effect. It's reasonable. And this is the Kitchens case, which is from the Western District of Virginia. Judge Kaiser relies heavily on it in his analysis. And it's where the court says it's reasonable only where it's finite and reasonably likely to enable the employee to return to work. There probably is an opportunity here for the court to give some guidance on what evidence you look to in making this decision. Now, I think it's clear from a 94 decision in the Tyndall case out of the circuit, where you look at the condition of the employee at the time of the termination to determine whether the accommodation is reasonable. And then the district court decisions are a little fuzzy as to when you look to see whether they could have performed the essential functions if granted that accommodation. And then again, relying on Kitchens, Judge Kaiser says the court may consider the post-termination progress and duration of plaintiff's condition in determining whether he could have performed the essential functions if afforded the accommodation. Now, if that is the standard, then it absolutely answers the question of what happens in this case and what the results should be. Because we know that even if Mr. Wilson had been granted the two additional days, he could not have returned to that job on April the 9th. And based on his own temposition testimony, after his surgery in November of 2010, he could never have returned to this job. So are you arguing that that is the standard, that we should consider all the post-termination evidence or not? Well, I think it's bifurcated. Is the accommodation reasonable? This court has said you must look at the evidence at the time of termination. But it's a two-pronged analysis. It's not only is the accommodation reasonable, but could the person have performed the job with the accommodation? And so if he wasn't granted the accommodation, and even if we assume it was reasonable, another two days, we still have to ask ourselves, could he have performed the job with a reasonable accommodation? And the answer to that is no, he could not have, if it was whether the accommodation was April 9th or a week and a half later. Because his own testimony is he didn't know. And an employer shouldn't be required to look into the future or have a crystal ball to know when this could occur. Now, the plaintiff relies heavily on Humphrey's case out of the Ninth Circuit. But in that case where the plaintiff had some kind of a compulsive OCD syndrome, it was her initial request for leave. And the doctor's note was opaque as to when she would be OK. And he said something like, well, she needs sufficient time to recover. And because the employer looked at that and said, oh, that's too indefinite. We're denying the leave. And in that case, the court reverses summary judgment. But that's not this case, as Judge Kaiser pointed out, because there had been no grant of leave. And it's a very doubtful presidential value in this circuit where, going back even to 95 in Myers, the court says, if it's an extension of leave, in particular, I mean, we had a leave period. We had a leave period of six. We had two. We had an additional day. And now it's additional leave. And the request is simply, I need more time to get better. And it's indefinite. And it's not finite. I think, well, we suggest that as a matter of law, that is not a reasonable accommodation. Anything else? No, Your Honor. Mr. Grimes? Just a couple of points with respect to kitchen first. My opponent says the kitchen is instructive, if not dispositive. The note in kitchen, and this is on 591 of the opinion at note four, a quote, Dr. Schama noted plaintiff was totally disabled from 5 slash 05 to indefinite, close quote. So that's quite different than what you have here. And again, turning to the conversation Judge Thacker, you raised on the night of April 7, or the day of April 7, 2010, when Mr. Wilson's mother took him back to work, here was the conversation. Nikki Steinspring said, you have to be here tonight. Mr. Wilson said, I can't. I can't see. And she said, your employment is terminated. You have to be terminated. And so I asked the court to consider whether that is a reasonable accommodation under the circumstances. Let me ask you this.  He agrees that you measure the nature of the accommodation as of the time the decision is made, April 7. He argues, though, that there is an additional requirement that he could have performed the job with the accommodation. And on that issue, we can look at all the evidence. What's your response to that? His testimony, I was looking for it as I was sitting there. Well, just as a matter of principle. As a matter of principle, I think you need to look whether he could do the job. And maybe that's snapshot versus snapshot plus. I don't know what to call that. Snapshot, that's when the employer makes a decision. Then you consider other evidence. But Wilson's testimony is there are universal jobs there. He could perform work in the roll tainter and so forth. There are many jobs he could have done even after the retina surgery, is what he said. That gets to a totally different issue. Yes, it does. Whether you have to accommodate a person by giving them a different job. And that raises a whole other body of jurisprudence. Well, the law is a broad class of jobs. But could he have, what were his limitations, say a year after he left Dollar General? There are no specific limitations other than lifting runs the risk of, heavy lifting runs the risk of suffering a detached retina. That's the most I can tell you. It doesn't say 5 pounds, 20 pounds, 50 pounds, whatever. But that was the concern with the detached retina. But Wilson said there's a broad class of jobs he could do. And that's in the record. If there are no other questions. Alright, thank you Mr. Grimes. Thank you. We'll come down and brief counsel and then take a short recess. This honorable court will take a brief recess.
judges: Paul V. Niemeyer, G. Steven Agee, Stephanie D. Thacker